459 So.2d 1068 (1984)
Ronald Dean JONES, Petitioner,
v.
STATE of Florida, Respondent.
No. 83-2547.
District Court of Appeal of Florida, Second District.
September 5, 1984.
Rehearing Denied December 5, 1984.
*1069 Walter O. Hobbs, II, of Harry M. Hobbs, P.A., Tampa, for petitioner.
Jim Smith, Atty. Gen., Tallahassee, and William I. Munsey, Jr., Asst. Atty. Gen. and Richard L. Greco, Asst. State Atty., Tampa, for respondent.
Rehearing En Banc Denied December 5, 1984.
LEHAN, Judge.
This case involves the constitutionality of an arrest made at a police roadblock maintained for the purpose of stopping motorists to ascertain and apprehend those to be charged with driving while under the influence of alcohol. At issue is whether the Fourth Amendment exclusionary rule should be applied to evidence obtained at the roadblock. This appears to be a case of first impression in this state.
Petitioner was arrested for driving while under the influence of alcoholic beverages (DUI), a violation of section 316.193, Florida Statutes (1983). He filed a pretrial motion to suppress all evidence obtained as a result of what he contends was an illegal seizure of him. The county court denied the motion. Petitioner then pleaded nolo contendere, reserving the right to appeal the denial of the motion to suppress. He appealed to the circuit court, which affirmed. He has petitioned this court to issue a writ of certiorari. We grant the petition, quash the circuit court's affirmance, and reverse the judgment of conviction. See Clermont Marine Sales, Inc. v. Harmon, 347 So.2d 839 (Fla. 2d DCA 1977). We hold that the police roadblock at which petitioner was apprehended and on the basis of which evidence against him was obtained was an unconstitutional invasion of his rights under the Fourth Amendment to the United States Constitution proscribing *1070 unreasonable searches and seizures.
On July 4, 1982, at about 2:30 a.m., the City of Tampa Police Department established a roadblock near the intersection of Dale Mabry Highway and Columbus Drive. The undisputed purpose of the roadblock was to apprehend DUI drivers. The three northbound lanes of Dale Mabry were blocked off to form a "funnel" requiring all traffic to travel in one lane and to pass by a police officer stationed on the roadway. That officer was instructed to stop every fifth automobile when traffic was heavy and to stop every third automobile when traffic was light. The stopped cars were directed off the roadway into an otherwise unused parking lot.
Waiting in the parking lot were five police officers who were to determine if the drivers were DUI. The only specific instruction given to those officers was to request the driver's licenses of the drivers of cars diverted from Dale Mabry into the parking lot. Each officer was left to his own method to determine whether he believed a driver was DUI.
Petitioner was the driver of a car that was diverted into the parking lot. The arresting officer requested petitioner's driver's license and began his investigation of petitioner's sobriety. The officer decided petitioner was DUI and arrested him.
We summarize our conclusions as follows:
(1) We hold that the arrest of petitioner at the roadblock was an improper seizure in violation of the Fourth Amendment.
(2) Our principal concern is not only with petitioner but with the rights of the vast bulk of those innocent citizens who may in the future be stopped at roadblocks like that involved in this case with the resulting loss of their Fourth Amendment rights to security and privacy.
(3) The subject of the validity of roadblocks, and roadblock arrests, is extremely difficult. The governing test  balancing the public interest in apprehending DUI violators against motorists' rights to security and privacy  may produce legitimate arguments either way.
(4) In arriving at our holding we follow guidelines which we believe have been set forth by the U.S. Supreme Court, although there is no controlling U.S. Supreme Court or Florida Supreme Court holding which is in point as to the precise issue of this case.
(5) Of the five cases in point in the courts of other states involving DUI roadblocks of varying descriptions, three (Massachusetts, with one dissent, South Dakota and Arizona) have held such roadblocks to be violative of the Fourth Amendment, and two (Kansas, with one dissent, and New Jersey) have held them to be proper. None of the five courts disagreed that the state has the burden of proof to show that a roadblock arrest is constitutional. Due to the scarcity of evidence in the record in the case before us, we believe that even the approaches taken by the New Jersey and Kansas courts would produce a holding that petitioner's arrest in this case was unconstitutional.
(6) Although our principal task is only to decide this case, which we have done as indicated in (1) above, we undertake in this opinion to provide at least general guidance to law enforcement authorities as to what types of DUI roadblocks may and may not produce valid arrests.
At the outset we should emphasize what our holding does not mean. It does not mean that petitioner's conduct is condoned. The issue is not to decide from hindsight whether or not the petitioner in this case was drunk and deserving of constitutional safeguards. "[H]indsight [should not be] coloring the evaluation of the reasonableness of a search or seizure." United States v. Martinez-Fuerte, 428 U.S. 543, 565, 96 S.Ct. 3074, 3086, 49 L.Ed.2d 1116, 1133 (1976). That type of erroneous approach to the issue would misconceive constitutional ramifications of cases of this kind. Since views seem to be espoused by some persons that to set free one person who has obviously committed a crime is wrong under any circumstances, we take pains at the outset of this opinion to point *1071 out what the fundamental issue does involve.
The fundamental issue here involves those motorists who are stopped by law enforcement authorities and who are driving while not under the influence of alcohol. Those motorists comprise the vast bulk of those who have been subjected to roadblocks of this kind in the past and who would be subjected to them in the future if we were to approve the roadblock in question here. Our holding is not keyed to any special concern for petitioner's individual sensibilities. He is the fortuitous vehicle for our consideration of the liberties of others  although also of his liberties in this case and in the future hopefully under circumstances potentially less adverse to him. We have substantial concern for the vast numbers of innocent motorists. We agree with Arizona Supreme Court Justice Feldman in State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 663 P.2d 992 (1983), a case more fully discussed below, that
[T]he issue here ... is whether the Fourth Amendment permits officers to stop and question persons whose conduct is innocent, unremarkable and free from suspicion.
663 P.2d 997. The following additional portion of Justice Feldman's concurring opinion puts the basic constitutional aspects in perspective and is deserving of reflection by those who are concerned about criminal law enforcement:
The question has frightening implications. The thought that an American can be compelled to "show his papers" before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals. If roadblocks can be maintained to stop all persons, regardless of how innocent their conduct, for the purpose of investigating or apprehending drunk drivers, then presumably similar stops of all citizens could be undertaken for questioning and surveillance with regard to other crimes... . It might be argued that if the law did permit such stops, we would have less crime. Nevertheless, our system is based on the idea that the risk of criminal activity is less of a danger than the risk of unfettered interference with personal liberty. The concept was succinctly expressed by a newspaper columnist who recently used these words in describing his opposition to roadblock stops for apprehension of drunk drivers:
"I ... have often thought that getting killed by some intoxicated idiot who crossed the median divider and hit me head-on would be the worst and most senseless way to die.
I mourn for the parents of children who have died at the hands of drunk drivers. But none of this makes a police state acceptable. Freedom doesn't come risk-free. I'm willing to take some risks in exchange for my freedom."
663 P.2d at 997.
At the same time we do not question the good faith of the police officers involved in this case nor their doubtless commendable motivations.[1] We do not doubt their desire *1072 to do their jobs  to apprehend criminals and protect the public  in the best ways they can. In their dealings with matters involving this area of the law they have not had the benefit of clear-cut guidance in all respects from the case law as to the proper parameters of their conduct. This has been and still is a developing area of the law. We undertake in this opinion to provide some measure of additional guidance. For that guidance we must use as the parameters of our authority interpretations placed upon the Fourth Amendment by the United States Supreme Court. We are aware of no case in which the issue here has been presented to the Florida Supreme Court.
The precise issue presented in this case  whether a warrantless police roadblock to apprehend DUI drivers by stopping cars without any articulable suspicion of illegal activity is constitutional under the Fourth Amendment  has not been widely addressed by American courts. We have found no federal or Florida case which addresses the precise issue. We have found only the above-referenced opinions of five other state courts dealing with it.
A stop of an automobile is a "seizure" under the Fourth and Fourteenth Amendments to the U.S. Constitution. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); United States v. Martinez-Fuerte, supra; United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The constitutionality of a particular seizure is judged by balancing the degree of its intrusion on the individual's Fourth Amendment interests in privacy and personal security against the seizure's promotion of legitimate governmental interests. Delaware v. Prouse, supra; Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
The U.S. Supreme Court has held unconstitutional the "roving patrol" type of warrantless stop, where an officer stops cars on the road at random with no probable cause to perceive criminal activity and even without meeting the "reasonable suspicion" standard established in Terry v. Ohio, supra; United States v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); United States v. Brignoni-Ponce, supra; Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).
In contrast, in United States v. Martinez-Fuerte, supra, the Supreme Court approved of a border patrol "checkpoint" type of permanent roadblock which was for the purpose of apprehending illegal aliens and which stopped all vehicles for brief questioning of occupants. The Court emphasized certain characteristics of the roadblock as supporting its validity, including its permanency, the decision to establish it having been made by officials on a higher level than patrol officers, lighted warning signs and signals commencing a mile before the checkpoint, official vehicles with red lights flashing, floodlights used at night, and the presence of uniformed officers. The Court reasoned that motorists would be less frightened when stopped under these circumstances than when stopped on the road by a single patrol car. "[T]he subjective intrusion  the generating of concern or even fright on the part of lawful travelers  is appreciably less in the case of a checkpoint stop." Martinez-Fuerte, 428 U.S. at 558, 96 S.Ct. at 3083, 49 L.Ed.2d at 1128. The Supreme Court, quoting from United States v. Ortiz, explained that

*1073 "[a]t traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion."
Martinez-Fuerte, 428 U.S. at 558, 96 S.Ct. at 3083, 49 L.Ed.2d at 1129. Permanent checkpoints were found to be less objectionable than roving patrol stops because
[f]irst, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops.
Martinez-Fuerte, 428 U.S. at 559, 96 S.Ct. at 3083, 49 L.Ed.2d at 1129. In addition to indicating that the permanency of a roadblock or checkpoint involves the lessening of surprise to innocent motorists, the Court pointed out that permanency, and therefore advance notice of a checkpoint on a heavily traveled road, may force other motorists onto less heavily traveled roads where they would be "more vulnerable to detection by roving patrols" who may stop a motorists for probable cause. 428 U.S. at 557, 96 S.Ct. at 3082, 49 L.Ed.2d at 1128.
The Supreme Court, in Martinez-Fuerte, pointed out that "the need for this enforcement technique is demonstrated." 428 U.S. at 562, 96 S.Ct. at 3085, 49 L.Ed.2d at 1131. Apparently this meant that comparably adequate alternative methods of apprehending illegal aliens were not available. The Court explained that the record in that case provided "a rather complete picture" of the effectiveness of the permanent checkpoint. 428 U.S. at 554, 96 S.Ct. at 3081, 49 L.Ed.2d at 1126. The Court decided that the government's interest in detecting illegal aliens outweighed the "minimal" intrusion at the roadblock. Most importantly, the Court in Martinez-Fuerte said that its holding approving checkpoint or roadblock stops was "limited to the type of stops described in this opinion. `[A]ny further detention ... must be based on consent or probable cause.'" 428 U.S. at 567, 96 S.Ct. at 3087, 49 L.Ed.2d at 1133-34. (emphasis added). Accordingly, an issue in the case before us is whether the roadblock in the case at hand resulted in any further detention than that which existed in the types of stops involved in Martinez-Fuerte. The state had the burden of proof to show that it did not.
In Delaware v. Prouse, supra, the U.S. Supreme Court held that random stops for driver's license checks were unconstitutional because, for one thing, there were more acceptable, alternative means by which to seek to assure highway safety. In dicta the Court suggested that a roadblock to check driver's licenses might be constitutional. "This holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673-74. Nothing in Delaware v. Prouse suggests, however, that the criteria for constitutionally permissible roadblocks as indicated in Martinez-Fuerte were relaxed.
*1074 The Court in Delaware v. Prouse articulated the Fourth Amendment purpose for invalidating unconstitutional seizures involved in automobile stops:
[T]o impose a standard of `reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order `to safeguard the privacy and security of individuals against arbitrary invasions ...' thus ... balancing ... intrusion ... against ... promotion of legitimate governmental interests.
440 U.S. at 653-54, 99 S.Ct. at 1396, 59 L.Ed.2d at 667.
The above referenced five reported cases from state courts concerning temporary roadblocks established to apprehend DUI drivers, all decided after Martinez-Fuerte, vary in their conclusions and in the factual situations involved. They are not consistent as to the significance of lack of permanency of a roadblock.
In State v. Olgaard, 248 N.W.2d 392 (S.D. 1976), a roadblock was found to cause constitutional violations. Therefore evidence obtained at the roadblock was found to be inadmissible, and the conviction of defendant was reversed. Olgaard concerned a roadblock conducted in connection with South Dakota's Alcohol Safety Action Program, concededly for the primary purpose of investigating alcohol-related offenses. There were several patrol cars with red lights flashing, a large stop sign set up in the road, and four highway patrolmen. All traffic in both directions was stopped. If an officer believed that a driver had been drinking, the driver was asked to pull over to the side of the road for further investigation. The officers relied upon their sense of smell, their observation of the driver's actions and appearance, and any presence of alcohol containers in the vehicle.
The South Dakota Supreme Court found that the roadblock violated the Fourth Amendment to the U.S. Constitution. The court recognized the state's interest in detecting drunk drivers and conceded that the need for investigative stops to apprehend drunk drivers "is surely as clear as that which was sufficient to justify the checkpoint stops in the Martinez-Fuerte case." Nonetheless, the court found that not all of the other factors found to justify stops in Martinez-Fuerte were present in Olgaard.
The South Dakota court believed that the Martinez-Fuerte decision turned upon the permanency of the checkpoint. In contrast, the court noted that drivers in South Dakota had had no warning of the DUI roadblock which "by its very nature" was set up to surprise motorists. Id. at 394.
The Olgaard court also referred to Martinez-Fuerte's emphasis on the point that the staff responsible for setting up a roadblock must be planning-level administrative staff rather than field officers. The record did not reveal who made the decision to set up the DUI roadblock, and the roadblock was found to have characteristics of a roving patrol.
In State v. Coccomo, 177 N.J. Super. 575, 427 A.2d 131 (N.J.Super.Ct.Law.Div. 1980), the constitutionality of evidence obtained and arrests made at a roadblock was upheld by a New Jersey appellate court. The written policy of the Roxbury Township Police Department for conducting roadblocks was to stop every fifth vehicle during light traffic hours to check for driver's license, registration, insurance card, and outward signs of intoxication. On the date in question, a roadblock was set up at 1:30 a.m., flares were placed on the road, a marked police car was parked by the side of the road, and a uniformed officer was standing under a street light waving every fifth vehicle off the road and into a parking lot. Other uniformed officers conducted questioning of the drivers.
The New Jersey court recognized the state's vital interest in promoting public safety by detecting drunk drivers. Balancing that interest against a motorist's interest in his expectation of privacy, the court found the roadblock procedure to be a reasonable and valid infringement on the expectation of privacy. The court described the intrusion on privacy as "minimal."
*1075 In reaching its decision, the Coccomo court particularly discussed the physical set-up of the roadblock and found adequate "safeguards for protection" of the physical safety of motorists. The court also noted that the police followed "specific, defined standards" in conducting the roadblock, with no discretion allowed to individual officers.
Although the facts of Olgaard and Coccomo are somewhat different, we do not believe the two holdings basically can be reconciled. The principal factor relied upon for the unconstitutionality of the roadblock in Olgaard  lack of permanence  existed in Coccomo. It is true that in Coccomo the factor of planning level supervision, which had been absent in Olgaard, existed. Nonetheless, the impermanency of the Coccomo roadblock was similar to that in Olgaard, in contrast to the roadblock/checkpoint permanency which the Supreme Court stressed in Martinez-Fuerte. The Coccomo opinion is very persuasive for validity of the type of roadblock involved. Due to what the New Jersey court referred to in Coccomo as "specific, defined standards" for the officers to follow in conducting the roadblock in that case, it did not appear to have roving-patrol characteristics as did the roadblock in Olgaard and therefore seems to us to be very close to the line between constitutional and unconstitutional roadblocks.
We have no quarrel with the self-evident truth that there may be surprise from a temporary roadblock, and the more surprise from a roadblock, the more effective the roadblock may be for the legitimate and important governmental purpose of reducing alcohol-related accidents. But we believe there is also substantial merit in the Olgaard opinion which, while finding that "the hazard to the public created by drunk drivers is so terrifyingly real as to require no extensive statistical demonstration," 248 N.W.2d at 394, nonetheless felt constrained to declare the roadblock a Fourth Amendment violation. No matter how bad the crime may be which law enforcement officers are trying to stop, they may not abandon Fourth Amendment concerns in their efforts, however commendable in purpose, to stop all citizens, including the vast bulk of them who are innocent, in order to sift out and apprehend violators.
State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 663 P.2d 992 (1983), declared evidence seized and arrests made at an Arizona roadblock to be unconstitutional. A roadblock to detect drunk drivers had been set up on two days for southbound traffic on a highway near Kingman, Arizona. The stop was conducted at a "port-of-entry" which consisted of a building, lanes covered by an awning, lighting, and traffic control devices flashing yellow and red. Pylons and lighted flares were placed in the road about 150 yards before the port-of-entry to channel all traffic into the roadblock. No warning signs or advance flashing lights announced the roadblock or its purpose, nor was there any advance publicity or warning to the public that a roadblock would be operated in that area on those dates.
The roadblock was conducted by officers and agents of the Arizona Department of Public Safety (D.P.S.), the Motor Vehicle Division of the Department of Transportation, and a drug enforcement unit. The decision to operate the roadblock was made by the D.P.S. lieutenant in charge of the D.P.S. district with headquarters in Kingman. He decided when, where and how to conduct the operation. He gave the twelve police officers conducting the roadblock no instructions regarding the procedure to be followed.
While agreeing that in theory a roadblock is less intrusive than the impermissible roving patrols which stop motorists without any reasonable suspicion of illegal activity, the Arizona Supreme Court, citing Martinez-Fuerte, found that the intrusion at the Kingman roadblocks was not minimal and was constitutionally impermissible. The court noted that the roadblocks involved discretionary law enforcement activity, were set up at the discretion of a local highway patrol officer, and were operated without specific directions or guidelines. *1076 The court also said motorists were taken by surprise, having had no prior notice of the roadblock.
The state argued in Ekstrom that, even if the intrusion was significant, the public interest in stopping drunk drivers outweighed the intrusion. The court rejected that argument because (1) the record disclosed no statistics concerning the extent of the drunk driver problem in Arizona, and (2) the record did not indicate whether the roadblocks were more effective in dealing with the problem than traditional roving patrols stopping cars upon reasonable suspicion. "If there is an adequate method of enforcing the drunk driving statute, there is no pressing need for the use of an intrusive roadblock device." 663 P.2d at 996.
In a special concurring opinion in the Ekstrom case, Justice Feldman agreed with the result but disagreed with his interpretation of the majority opinion that a properly instituted roadblock could not be upheld. Justice Feldman took judicial notice of statistics showing the extent of drunk driving and numbers of accidents and casualties caused by drunk driving. He concluded that these statistics made it obvious that traditional law enforcement methods (arrests upon reasonable suspicion by roving patrols) were inadequate to satisfy society's compelling interest in enforcing drunk driving laws. Therefore, he reasoned, more intrusive methods, such as properly conducted roadblocks, might be considered reasonable.
We also disagree that no DUI roadblock is constitutionally permissible. We do not believe that the Fourth Amendment calls for the shackling of efforts to enforce the criminal laws when necessary to interdict serious crime if basic rights of innocent citizens are not thereby seriously jeopardized. We believe that such roadblocks can be implemented to avoid unduly serious jeopardy to those rights, as indicated further below.
Justice Feldman in Ekstrom recognized the intrusion at a roadblock as a "substantial infringement upon liberty of movement" but analogized it to the restraints imposed at airports to deal with the serious dangers of bombings and hijackings. He felt that the intrusion could be kept to a minimum by adoption of standards and plans to lessen the amount of discretion of the field officers who conduct the roadblock. Justice Feldman stated that he would legitimatize roadblocks of that type as being based upon deterrent, rather than investigative or apprehension, purposes. 663 P.2d at 998, 1001. He did agree with the majority that the roadblock in question was illegal because it lacked executive-level planning and procedural standards.
We find ourselves in agreement with the majority result in Ekstrom and in general agreement with views expressed by Justice Feldman. Justice Feldman also advocated as a goal of "a deterrent roadblock ... advance publicity in the media and on the highways." 663 P.2d at 1001. We would be inclined to think that such advance publicity may well provide a meaningful substitute for the type of permanency, and therefore advance knowledge by motorists, of the roadblock in Martinez-Fuerte. Advance publicity would seem to lessen questions as to whether a roadblock constitutes an unwarranted intrusion upon innocent motorists who would, with such publicity, anticipate and understand the circumstances. While, admittedly, advance notice would reduce chances of catching some criminals, it might well at the same time have some tendency to dissuade motorists from driving while drinking without unduly violating the interests of the vast majority of innocent drivers.
In State v. Deskins, 234 Kan. 529, 673 P.2d 1174 (1983), the Kansas Supreme Court, with one dissent, upheld the constitutionality of a roadblock. The roadblock had been set up at 10:00 p.m. at an intersection in Topeka, ostensibly to check drivers' licenses. However, the state conceded that its purpose was to catch drunk drivers and that the checking of licenses was a facade. The roadblock was operated by 35 to 40 state, county and city police officers. The officers were briefed by supervisory personnel who also selected the location of *1077 the roadblock. The roadblock was in a well-lighted area, and a police car with flashing lights was placed at each of the four corners of the intersection. All vehicles in both directions were stopped. The officers were in uniform, and there was a sufficient number of them present to ensure that the length of an intrusion was kept to a minimum.
After reviewing the U.S. Supreme Court border patrol cases and the foregoing DUI roadblock cases from other states, the Kansas Supreme Court set out conditions and factors to be considered in determining whether the balancing test tipped the scale in favor of the validity of a DUI roadblock. These were: (a) degree of discretion left to field officers; (b) location, time and duration of the roadblock; (c) standards set by superior officers; (d) advance notice to public; (e) warning to approaching motorists; (f) degree of fear or anxiety caused; (g) length of detention of each motorist; (h) safety conditions; (i) physical factors of the method of operation; (j) availability of less intrusive methods for combating the problem; (k) effectiveness of the procedure; and (l) any other relevant circumstances. The court stated that not all of the factors need be favorable to the state but noted that some (such as unbridled discretion) would be fatal regardless of the existence of other favorable conditions. The court, after comparing the roadblock in question with the foregoing conditions and factors, found it to be constitutional.
Justice Prager dissented, noting that the controversy was a difficult one. Reviewing the conditions and factors listed by the majority opinion, Justice Prager felt that the Kansas roadblock was deficient in the following ways: (1) the record showed no specific standards or procedures set up by supervisory personnel to govern the operation of the roadblock and no limitations on the discretion of the officers at the scene; (2) the roadblock was not at a permanent location; and (3) there was no advance warning to approaching motorists.
Another factor upon which Justice Prager focused most closely was the effectiveness of the roadblock and the availability of other methods by which to apprehend DUI violators which are less intrusive and equally or more effective. Thirty-five officers were on duty for the four hours of the roadblock (presumably 140 man hours). Between 2,000 and 3,000 vehicles were stopped. Only 15 DUI arrests were made. Justice Prager pointed out that, while roadblocks for license checks and for illegal aliens have been approved, there is a distinction between those violations and drunk driving: an officer cannot watch a car traveling down the road and determine that its driver has no license or that the car contains illegal aliens, but he can spot drunk drivers that way. Therefore, because there was an alternative and less intrusive method to detect drunk drivers and because the roadblock was not shown to be more effective than the alternative and traditional method, Justice Prager concluded that the DUI roadblock was unconstitutional.
We find much merit in Justice Prager's dissent in Deskins. It seems to us that the Deskins majority stressed the "enormous magnitude," 673 P.2d at 1181, of the drunk driving problem, as did the Coccomo court, in justification for disregarding what can be perceived as the dictates of the U.S. Supreme Court in Martinez-Fuerte concerning Fourth Amendment rights of innocent motorists. A basic key to these cases is whether the governmental interest in curtailing drunk driving by the use of roadblocks is actually so "overwhelming" as the Kansas Supreme Court in Deskins characterized it, 673 P.2d at 1181, as to justify serious intrusions into the security and privacy of innocent citizens who constitute the overwhelming majority of those stopped at these types of roadblocks. In answering that question, we must take into account, as did Justice Feldman in Ekstrom, the ramifications of approving these types of intrusions upon innocent citizens in law enforcement efforts to apprehend suspected violators of a broad range of other criminal laws.
*1078 The issue involved is extremely difficult. There is no question that, as Justice Prager wrote, "there is a wide difference of opinion on this issue held by reasonable persons of good faith." 673 P.2d at 1186. In this opinion we are indicating some agreement or disagreement with various views expressed in other states. But we have no doubt of the closeness of the balance of the arguments on one side or the other. Again, as Justice Prager said, the basic balancing challenge is, "Does the public interest in a DUI roadblock ... outweigh the individual's right to be free from intrusion on his or her right of privacy?" 673 P.2d at 1186. However, we would again clarify and expand upon the foregoing statement of the issue by stressing that "the individual's right to be free" refers also to the rights of individuals whose conduct is innocent and is not centered on the rights of the individual DUI arrestee alone.
In the final analysis we are inclined to agree with Justice Prager concerning the unconstitutionality of the roadblock stops in Deskins for the same principal reasons, outlined in more detail further below, for which we find the roadblock stop in this case to be unconstitutional: The point is not whether drunk drivers are a danger and a serious threat to public safety. That must be conceded by any reasonable person of good faith. The point is that the public interest in apprehending drunk drivers does not justify the use of any indiscriminate law enforcement methods of investigation and apprehension. As an admittedly extreme example for the purpose of illustrating that point, no reasonable person of good faith would disagree that house to house searches of arbitrarily selected neighborhoods to discover which citizens are drunk and are about to drive or might drive, which would terrorize the citizenry in the process, would be wrong. That that example is absurd in this country today may serve to emphasize what the Fourth Amendment has accomplished relative to the disregard for individual rights which had existed under British colonial rule not long before the Bill of Rights was adopted.
In Commonwealth v. McGeoghegan, 389 Mass. 137, 449 N.E.2d 349 (1983), the main purpose of a roadblock conducted by a city police department was to detect drunk drivers. The plan was formulated earlier the same day by the police chief and four subordinates. The trial judge found that the roadblock was poorly illuminated and unsafe, the mechanics of the roadblock were left to the discretion of the officers at the roadblock, the officers used their own discretion in deciding which cars to stop, and traffic backed up for at least two-thirds of a mile.
The Massachusetts court found that the temporary roadblock in question was unconstitutional because of insufficient police presence, inadequate lighting and warning, arbitrariness, and undue delay. Without specifically saying that a DUI roadblock could ever be constitutional, the court set out "some observations" relevant to the lawfulness of roadblocks. The court said that selection of vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized, and the procedure must be conducted pursuant to a plan devised by law enforcement supervisory personnel. The court further stated, "While we do not suggest that advance notice is a constitutional necessity, advance publication of the date of an intended roadblock, even without announcing its precise location, would have the virtue of reducing surprise, fear, and inconvenience." 449 N.E.2d at 353.
One judge dissented because he felt that many of the trial judge's findings about the conditions of the roadblock were unsupported by the record. He believed that the majority's guidelines were met in the case.
We find ourselves in agreement with the McGeoghegan majority result and with much of its rationale. Our reasoning is much the same as what we have said above with reference to the other state cases.
We have accomplished our primary task of deciding the case before us. The roadblock did not meet the types of criteria which we believe to be important as referred to in our foregoing discussion of *1079 Martinez-Fuerte and cases in other states. In our view, on the record before us the roadblock involved in this case would not even have passed muster under the less rigorous New Jersey and Kansas criteria. The state either introduced no evidence at all as to, or presented insufficient evidence to meet, the relevant criteria which might support a roadblock. See Tibbs v. State, 397 So.2d 1120 (Fla. 1981).
To further explain why we believe those criteria were not met, and in an effort to provide more specific future guidance, we refer to what we view as the most important of the criteria as follows:
First, was the roadblock conducted pursuant to a plan set up by supervisory personnel and was little or no discretion in the method of operation and selection of vehicles left to the officers conducting the roadblock? We have before us no evidence as to what level of law enforcement personnel made the decision to set up the roadblock or made the decisions regarding location and method of operation. The record does show that the officers who were to participate in the roadblock were briefed by a sergeant. The officers in the parking lot were told to ask for driver's licenses but were given no further instructions. At deposition, the officer who made the arrest in this case stated that he received no instructions as to what to look for, saying, "[T]hat's my discretion."
Second, was the safety of motorists assured by proper means, including adequate lighting, warning signs or signals, and clearly uniformed or otherwise identifiable police officers? Although the record shows barricades and traffic cones channeling traffic from three lanes to two lanes to one lane, the record contains no evidence as to any safety features, such as flares, flashing lights or signs. Whether we should assume that the city police officers at the scene were in uniform we need not decide. The record does not say.
Third, was the degree of intrusion upon motorists and the length of detention of each motorist minimized? Although the record shows that five officers were in the parking lot, the record does not indicate whether or not this was a sufficient number to handle expeditiously the volume of vehicles or how long the average motorist waited. Although there were three officers on Dale Mabry Highway, the record does not indicate whether this number was actually adequate to expeditiously maintain the traffic flow with minimum intrusion upon motorists who were not stopped.
Fourth, was that roadblock procedure for apprehending criminal law violators significantly more effective to combat an egregious law enforcement problem of very serious proportions than other available less intrusive means? The question of whether some of these aspects may be established by judicial notice or must be shown by evidence at trial has not been presented or argued to us. The procedural requirements at trial for both methods of proof are well established. The arresting officer testified that between 100 and 200 cars were stopped and 5 or 6 DUI arrests were made. There is no evidence as to how this figure compares with the number of DUI arrests which can be anticipated from using the same number of officers to conduct another type of operation, such as roving patrols acting upon reasonable suspicion, to combat the DUI problem.
Also, the record indicates that the roadblock was temporary but contains no evidence as to whether or not there was advance warning or notice to the public. We have referred above to the Martinez-Fuerte factor of permanency, or, as we have noted, the possible substitution of advance notice of a roadblock for permanency of a roadblock. It may well be that that factor is not as significant in a DUI roadblock as in an illegal alien roadblock of the type considered in Martinez-Fuerte. It is possible that the Supreme Court's concern in that regard was related to alleviation of unjustified discrimination by roving patrols against Americans bearing the same physical characteristics as illegal aliens in that area of Southern California. We tend to agree with McGeoghegan that advance notice may not be an absolute constitutional *1080 necessity for all DUI roadblocks. Nonetheless, "advance publication of the date of an intended roadblock, even without announcing its precise location, would have the virtue of reducing surprise, fear, and inconvenience." 449 N.E.2d at 353. Fulfillment of other criteria noted above may also have the same type of virtue. To the greater extent that factors surrounding a particular roadblock reduce surprise, fear and inconvenience, the greater tendency there will be for a roadblock to not have Fourth Amendment problems.
Other criteria discussed in the cases cited above are, of course, also relevant. Just as in this case of first impression the lack of a more descriptive record may be understandable, we trust the need for a more complete record is clear.
As noted at the outset of this opinion, Justice Feldman expressed in Ekstrom concerns as to Americans having to "show their papers" before exercising their rights. A similar type of concern was expressed by Justice Prager in Deskins: "If each of [the] political subdivisions [in Kansas] decides to maintain a roadblock, we could have `Checkpoint Charley' at the boundary of every city and every county." 673 P.2d at 1188. Similarly, if the Tampa police can set up a temporary roadblock of this kind for DUI purposes on Dale Mabry Highway, why could not the Tampa Police have also set up other such DUI roadblocks at various other locations in Tampa at the discretion of other sergeants (however much sergeants do deserve and have earned respect and authority)? For that matter, why could not they set up still other roadblocks for a variety of other law enforcement purposes? And if the Tampa police could do so, why not the Hillsborough County sheriff's department, the Pinellas County sheriff's department, the City of St. Petersburg police, and law enforcement authorities of all the various small municipalities in the area, with the end result being "Checkpoint Charleys" for innocent motorists to encounter perhaps even multiple times in the course of a drive? We, as Justice Prager, could not accept this as a way of life in our constitutional democracy.
We do not suggest that law enforcement authorities in Florida contemplate a scenario that might be indicated by the foregoing questions. We expect that the judgment of law enforcement supervisory personnel in establishing proper roadblocks, if the foregoing criteria are fulfilled, would take into account those concerns expressed by Justices Feldman and Prager which we agree are valid and important. Even a valid roadblock within the foregoing criteria should be employed with reasonable circumspection. Our democratic form of free government continues to exist because our laws do not permit restraints of that kind upon our freedoms. As is sometimes also attributed to Thomas Jefferson, "Eternal vigilance is the price of liberty." John Philpot Curran, Speech Upon the Right of Election (1790).
We do not have before us for decision the application of the Fourth Amendment to other types of police roadblocks, e.g., those to apprehend fleeing felons believed to be in the vicinity.
We should add that if a roadblock is established in a constitutionally permissible way, arrests of individual motorists ensuing therefrom should nonetheless be based upon probable cause. Only if an officer, based upon his observations following a proper stop of a vehicle, has probable cause to believe that the driver is DUI could the officer conduct a more extensive investigation, such as asking the motorist to exit the car for a roadside sobriety test. See, e.g., United States v. Miller, 608 F.2d 1089 (5th Cir.1979), cert. denied 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1981); United States v. Prichard, 645 F.2d 854 (10th Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981); Peoples v. Carlson, 677 P.2d 310 (Col. 1984).
The petition for writ of certiorari is granted, the decision of the circuit court is quashed, and the judgment of conviction by the county court is reversed. Petitioner shall be discharged.
*1081 We have recognized that the subject of this opinion is susceptible to legitimate debate. There is no doubt that the subject is of substantial importance to the public and to law enforcement authorities. We feel confident of the correctness of our holding and our opinion as providing proper guidelines, however general, for the trial courts of this state as well as law enforcement authorities. Nonetheless, we feel it would be consistent with the constitutional provisions establishing district courts of appeal and with the tenet that the Florida Supreme Court is the paramount policy-making Florida court that the Florida Supreme Court pass upon this matter which is so important and which has not previously been addressed in Florida, whether on review of this case or in another DUI temporary roadblock case. Whether the state will seek Florida Supreme Court review in this particular case we will not speculate. In any event, we certify to the Florida Supreme Court as a matter of great public importance the following question: Can a warrantless temporary roadblock which is established to apprehend persons driving while under the influence of alcohol and which stops automobiles without any articulable suspicion of illegal activity produce constitutionally permissible arrests?
RYDER, C.J., and DANAHY, J., concur.

ON MOTION FOR REHEARING EN BANC
LEHAN, Judge.
In its motion for rehearing en banc the state contends for the first time that this court should not have granted the petition for writ of certiorari because the circuit court's decision contained no "violation of a clearly established principle of law resulting in a miscarriage of justice," which is the standard set out in Combs v. State, 436 So.2d 93 (Fla. 1983). The state contends that since, as our opinion points out, this case is one of first impression in Florida and since cases from other states appear to be split on matters of this type, the circuit court's decision could not have been a violation of a clearly established principle of law.
We disagree. While it is true that the law applicable to the particular factual issue in this case  the constitutionality of a roadblock to apprehend DUI drivers  is still developing, the framework of constitutional principles in the area of unreasonable searches and seizures has been established. Our opinion applied those constitutional principles to the facts of this case and found this particular roadblock lacking. Consistent with Clermont Marine Sales, Inc. v. Harmon, 347 So.2d 839 (Fla. 2d DCA 1977), cited in our opinion, we concluded that there had been a departure from the essential requirements of law. The error was of "such magnitude that the aggrieved party [was] effectively ... denied his day in court," Clermont, 347 So.2d at 841, and was one "resulting in a miscarriage of justice." Combs, 436 So.2d at 96.
The state refers to the split of authority among five other state courts whose opinions were discussed in our opinion. (Not all of those cases had been decided at the time of the lower courts' decisions in this case; of those five cases, two had been decided prior to the county court's decision in this case; those two and a third case had been decided prior to the circuit court's decision.) We pointed out in our opinion that we believe that all five of those state courts would have found the roadblock in this case to have been unconstitutional.
The split arises regarding fact situations different from the situation here but which could well exist in other DUI roadblock cases in Florida. We addressed those situations to make it clear that our opinion should not be construed as saying that all DUI roadblocks are ipso facto either constitutional or unconstitutional and as future guidance for the trial courts to promote consistency of decisions.
The motion for rehearing en banc is denied.
RYDER, C.J., and DANAHY, J., concur.
NOTES
[1] Our lack of doubt as to the good faith of the police in this case does not bring into play the "good faith exception" to the exclusionary rule which was created by United States v. Leon, ___ U.S. ___, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and followed in Massachusetts v. Sheppard, ___ U.S. ___, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

Leon is not applicable. It involved police implementation of a deficient search warrant issued by a magistrate. On the other hand, the issue before us involves applying to warrantless police activity the balancing test referred to below in this opinion. Also in the case before us, resolution of the central issue is necessary to guide future action by law enforcement agencies. As Leon says, "If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers ... nothing will prevent reviewing courts from deciding that question before turning to the good faith issue." Leon, ___ U.S. at ___, 104 S.Ct. at 3422. Also, Justice Blackmun's concurring opinion in Leon points out that the Court's holding is limited to search warrant situations: "[T]he Court has narrowed the scope of the exclusionary rule because of an empirical judgment that the rule has little appreciable effect in cases where officers act in objectively reasonable reliance on search warrants... . [T]he Nation's law enforcement officers ... must continue to observe the Fourth Amendment in the wake of today's decisions... ." Leon, ___ U.S. at ___, 104 S.Ct. at 3424. Justice Brennan's dissent in Leon states that "the Court's decisions are clearly limited to the situation in which police officers reasonably rely upon an apparently valid warrant in conducting a search... ." Leon, ___ U.S. at ___, 104 S.Ct. at 3446.
Similarly, Sheppard, which concerned application of the principles announced in Leon, involved a search warrant which was "subsequently invalidated because of a technical error." Sheppard, ___ U.S. at ___, 104 S.Ct. at 3426. "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." Sheppard, ___ U.S. at ___, 104 S.Ct. at 3429. In the case before us, we deal with a search by police, not with an action of a magistrate or judge.